UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF INDIANA

INDIANAPOLIS DIVISION

| | |
|---|---|
| DEVIN PUGH, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,<br><br>Defendant. | Case No:  1:15-cv-1747 |

**CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ....................................................................................................1

II.     PARTIES ................................................................................................................3

     A.      Plaintiff ......................................................................................................3

     B.      Defendant ...................................................................................................3

III.    JURISDICTION AND VENUE ..............................................................................5

IV.     RELEVANT MARKET..........................................................................................5

V.      UNLAWFUL AGREEMENTS IN RESTRAINT OF TRADE OR COMMERCE ..........11

     A.      Division I Anticompetitive Restrictions .................................................12

          1.      NCAA's Prohibition on Multi-year Division I Football
              Scholarships. ..........................................................................12

          2.      Caps on the Number of Division I football Scholarships. .........................15

          3.      Restrictions on Players' Ability to Transfer ………………………………16

VI.     INJURY TO PLAINTIFF AND CLASS MEMBERS ....................................................22

VII.    CLASS ALLEGATIONS ...........................................................................................28

VIII.   TOLLING OF THE STATUTE OF LIMITATIONS........................................................32

IX.     CAUSES OF ACTION .................................................................................................33

FIRST CAUSE OF ACTION - VIOLATION OF SECTION 1 OF THE SHERMAN ACT
     15 U.S.C. § 1 ................................................................................................................33

SECOND CAUSE OF ACTION - VIOLATION OF SECTION 1 OF THE SHERMAN ACT
     15 U.S.C. § 1 ................................................................................................................34

PRAYER FOR RELIEF ...............................................................................................................35

JURY TRIAL DEMANDED ........................................................................................................36

Plaintiff, by and through his attorneys, based on his individual experiences, the investigation of counsel, and upon information and belief, alleges as follows:

## I.       INTRODUCTION

1.       This suit challenges the National Collegiate Athletic Association ("NCAA") rules which prohibited multi-year athletic scholarships for Division I football players and the continuing cap on the number of football scholarships a Division I football team may award. These rules are horizontal restraints intended to reduce the cost of essential inputs in the production of high quality Division I football games.

2.       Only recently, and only after litigation in this Court, did the NCAA abandon its prohibition on athletics-based Division I football scholarships of a duration in excess of one year.

3.       Though it has abandoned the multi-year prohibition, the NCAA continues to artificially restrict the total number of available Division I football scholarships.

4.       By unlawfully agreeing not to offer multi-year Division I football scholarships, the NCAA and its member institutions ensured that student-athletes who were injured or who simply did not meet the school's expectations could be cut from a team and their scholarships terminated.

5.       Once their scholarships are terminated, Division I football student-athletes who wish to remain in school face three unpalatable options:  (i) pay tuition out of pocket, often by taking on tens of thousands in loans, (ii) uproot themselves and transfer to another institution that will provide them with a scholarship, or (iii) uproot themselves and transfer to a new school and pay tuition.  They would not incur these expenses and/or hardships but for the existence of the challenged unlawful restraint and agreement.

6.    By unlawfully agreeing to limit the number of Division I football scholarships that a member institution can grant in any given year, the NCAA and its member institutions have ensured that student-athletes in the class receive tens of millions less for their labor for member institutions than they would receive – and the member institutions would pay – in a competitive market.

7.    Plaintiff also challenges the NCAA's rules that prevent Division I football players from transferring to other NCAA Division I schools without losing athletic eligibility for a year. The NCAA's limitation on the mobility of college athletes is patently unlawful.  For a striking contrast, one can simply examine the unfettered mobility of the players' coaches.  Football coaches, including assistant coaches, are free to leave a school at any time they choose to take another job in the college or professional football ranks.  This ability to better their own situation has allowed coaches to reap enormous financial benefits.  At least 34 Division I head football coaches now earn more than $3 million per year, even prior to the calculation of what can often be performance bonuses in excess of $1 million.[1]  At least 37 Division *assistant* coaches earn more than $600,000 per year, prior to the calculation of performance bonuses.[2]

8.    Players, however, suffer a severe penalty for transferring – the loss of a year of athletics eligibility.  This can make them a very unattractive option for coaches who are under constant "win now" pressure.  The NCAA's transfer rules restrain players' ability to make the best choices for themselves, including ones based on financial considerations, academics considerations, athletics considerations, and personal circumstances.  The NCAA's transfer rules are anticompetitive and violate the Sherman Act.

---

[1] http://sports.usatoday.com/ncaa/salaries/ (last visited November 3, 2015).

[2] http://sports.usatoday.com/ncaa/salaries/football/assistant (last visited November 3, 2015).

## II.      PARTIES

### A.      Plaintiff

9.      Devin Pugh is a citizen of the United States and Utah.  A skilled cornerback, Devin was recruited by numerous colleges out of high school, offered Division I football grants-in-aid by numerous Division I schools and ultimately selected Weber State University, a Division I FCS school in Utah in 2010.  Devin chose Weber State based on the pledge of the head coach that his Division I football grant-in-aid would be renewed annually so long as he did well academically and remained eligible for NCAA competition.

10.      In approximately December 2011, Weber State named a new head football coach. In December 2012, Devin was informed by the new coach that he would no longer have a football grant-in-aid at Weber State.  Devin looked into transferring and received grant-in-aid offers from several Division I schools.  However, when he was unsuccessful in securing a waiver of the NCAA transfer rules pursuant to which he would be forced to sit out of competition for a year, all of the schools rescinded their scholarship offers.  Unable to stay in school without a scholarship, Devin was forced to transfer to CSU Pueblo, a Division II school.  Devin's grant-in-aid at CSU Pueblo was substantially less than what he received at Weber State.  As a direct result, he was forced to borrow double the amount of money he had had to borrow at Weber State just to cover his expenses.

### B.      Defendant

11.      Defendant NCAA is an unincorporated association that acts as the governing body of college sports.  Through the NCAA Constitution and Bylaws, the NCAA and its members have adopted regulations governing all aspects of college sports.  The NCAA Constitution and Bylaws were adopted by votes of the member institutions and may be amended

by votes of the member institutions.  Thus, the rules set forth in the NCAA Constitution and Bylaws constitute horizontal agreements between the NCAA and its members and between members of the NCAA.

12.    The NCAA includes 1,102 active member schools, and these schools are organized into three Divisions.  Division I includes 348 schools, including 242 with extensive football programs.  Divisions II and III include schools with much less extensive or no football programs.

13.    As a practical matter, any academic institution that wishes to participate in any meaningful way in the highest and most popular levels of college football must maintain membership in the NCAA and abide by the Division I rules and regulations promulgated by the NCAA and its members.  There is no practical alternative to Division I NCAA membership for any academic institution that wishes to participate at the highest levels of college football.  Indicative of the NCAA's market power, when the NCAA bans a university from participating in NCAA sponsored collegiate competition, this prohibition is colloquially known as the "death penalty."

14.    Because the NCAA and NCAA member institutions control the highest and most popular levels of college football, any individual who wishes to provide athletic services in exchange for the payment of *full* tuition for an undergraduate academic and athletic education must by necessity attend an NCAA Division I member institution.  There are zero practical alternatives that can provide the unique combination of attributes offered by Division I NCAA football schools:  (i) the ability to exchange athletics services for the payment of the full cost of an education plus room and board, (ii) high quality academic educational services, (iii) top-of-the-line training facilities, (iv) high quality coaches that will best be able to launch players to

professional careers, (v) national publicity through national championships and nationwide broadcasting contracts, and (vi) competition at the highest level of amateur football.

15.     There is no major college football program in the United States that is not an NCAA Division I member, abiding by the NCAA rules.  Division I NCAA member institutions are by far the largest purchasers of student football labor in the United States, and the NCAA and its Division I member institutions have monopsony power over the market for student football players.

### III.     JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. §§ 4 and 15 and 29 U.S.C. §§ 1331 and 1337, in that this action arises under the federal antitrust laws.

17.     This Court has personal jurisdiction over the Defendant because its headquarters are located in this district and it transacts business in this district, including, but not limited to, sporting events.  Furthermore, NCAA member institutions and co-conspirators are located in this district.

### IV.     RELEVANT MARKET

18.     The relevant market is the nationwide market for the labor of Division I football student athletes.  In this labor market, student athletes compete for spots on Division I football athletic teams of NCAA member institutions, and NCAA member institutions compete for the best Division I football collegiate student athletes by paying in-kind benefits, namely, Division I football scholarships, academic programs, access to training facilities, and instruction from premier coaches.

19.     NCAA Division I football is further divided into two subdivisions, Division I-A, now known as FBS (Football Bowl Subdivision), and Division I-AA, now known as FCS (Football Championship Subdivision).  These subdivisions constitute distinct submarkets within the broader labor market for Division I football student athletes.

20.     NCAA rules currently permit the award of 85 full scholarships for FBS teams, and 63 full scholarships for FCS teams.

21.     Division I football programs compete at the highest level of the college sport. They generate billions of dollars in revenue from attendance fees, TV contracts, sponsorship, and alumni contributions.

22.     The superior revenues generated by Division I football programs enable FBS and FCS schools to provide superior coaching, playing and training facilities, and travel opportunities to football players.

23.     NCAA Division II football programs are not in the same market as Division I football programs.

24.     The total number of Division II scholarships is limited to 36.  A typical NCAA college football squad numbers 100 players.  So, almost no Division II football athletes are awarded a full scholarship.

25.     Division II football programs have smaller budgets, play close to home, and do not generate excess revenue for the school as a whole.

26.     NCAA Division III football programs are prohibited from awarding athletic scholarships so they are not in the relevant market.

27.     The NAIA is the only other association sponsoring college football.  It is made up of smaller schools, and NAIA rules permit only 24 scholarships.  So, almost no student-athlete

receives a full scholarship to play football.  NAIA football programs are also not in the relevant market.

28.     Two-year junior colleges cannot award college degrees.  Superior high school football players do not choose to play at a junior college unless they are unable to meet NCAA academic eligibility standards.

29.     The differences between the NCAA divisions, and between the NCAA and the NAIA, are demonstrated by a variety of additional factors.

30.     Total football revenue is probably the most critical factor in differentiating the market.  Total football revenue for the 242 Division I schools in 2011 was well over $3 billion, with the majority coming from the 120 FBS schools ($2,956,499,371).  Total football revenue for the 122 FCS schools was $375,774,921 in 2011.

31.     In contrast, total football revenue for the 157 Division II football schools was less than half of the FCS revenue ($181,929,450).

32.     Football revenue for *all* NAIA schools was $83.6 million.

33.     For 2011, average football team revenue for FBS schools was $24.6 million.  Average term revenue for FCS schools was $3.1 million.  Average football team revenue for Division II schools was $1.2 million.  Average football revenue for NAIA schools was even less, approximately $1.0 million.

34.     The large differences in revenue between Division I schools and NAIA and Division II schools are driven in part by the differences in total attendance.

35.     In 2012, FBS schools had a total attendance of 37,170,235; FCS schools had an attendance of 5,967,272 fans, and *all* 157 Division II football teams drew 3,006,297.  Total 2011

attendance figures for the 81 NAIA football schools were not available but the number is insignificant when compared to NCAA Division I attendance figures.

36.     Average attendance figures also differentiate the relevant market.  In 2012, FBS schools averaged 45,440 per game.  FCS schools averaged 9,041 per game.  Division II football averaged 3,520 per game.

37.     NAIA schools play in much smaller stadiums.  Marion University, an NAIA school, has a stadium with a maximum capacity of 3,000.  Several Division I football schools compete in stadiums with a capacity in excess of 100,000.

38.     The differences between college football divisions in the quality of competition and the level of institutional support cause superior high school football players to choose Division I scholarships over Division II or NAIA scholarships.  For these players Division II and NAIA football is not a substitute for Division I football.

39.     The intense recruitment of talented high school football players has led to the growth of companies which scout and rate thousands of players.  The most prominent company, rivals.com, rates high school players on a 0 to 5 star scale.  Of the 21,198 athletes tracked by rivals.com between 2007-2011 which received a Division I scholarship offers, fully 90% accepted.  The vast majority of the other 10% opted out of college football rather than accept a scholarship at a Division II or NAIA school.  Again, this indicates that Division II and/or NAIA football is not an adequate substitute.

40.     The submarket of FCS football is also its own relevant labor market for talented high school players.

41.     FCS schools regularly play against FBS schools.  FCS games are regularly televised on national TV channels.  Yet if given a choice between an FBS scholarship and an

- 8 -

FCS scholarship, 85% of the high school players tracked by rivals.com between 2007 and 2011 chose the FBS scholarship, and 5% chose the FCS scholarship.  (The other 10% did not play college football.)

42.     The relevant market is illustrated by the experience of Plaintiff Devin Pugh. Devin was recruited by FBS and FCS schools, received a full scholarship offer from one FBS school, and received full scholarship offers from numerous FCS (then Division I-AA) schools in the country.  Devin chose Weber State based on the pledge of the head coach that his Division I football grant-in-aid would be renewed annually so long as he did well academically and remained eligible for NCAA competition.  If, initially, he had been offered a full scholarship at a Division II or NAIA program, he would not have accepted.  After a new head coach withdrew his scholarship, Devin eventually accepted a scholarship offer and transferred to a Division II school because NCAA transfer rules would not allow him to immediately play football at any Division I school.

43.     But for the NCAA restrictions on the number of football scholarships Division I schools may award, Devin would have had more schools to choose to play for, including FBS and FCS teams.

44.     The relevant geographic market is the United States.  All Division I football teams are located in the U.S.  As a uniquely American sport, 99.9% of all Division I football players are from the United States.

45.     Despite the nonprofit status of NCAA member schools, the transactions those schools make with premier Division I football athletes – full scholarships in exchange for athletic services – are not noncommercial, since schools make millions of dollars annually as a result of these transactions.

46.     Thus, the transactions between NCAA schools and student-athletes are, to some degree, commercial in nature, and therefore take place in a relevant market with respect to the Sherman Act.

47.     Given the competition for Division I football athletes, the only reason that NCAA Division I schools do not engage in price competition is due to the fact the Bylaws at issue prevent them from doing so.

48.     Colleges do, in fact, compete for student-athletes, though the price they pay involves in-kind benefits as opposed to cash.  For instance, colleges may compete to hire the coach that will be best able to launch players from the NCAA to the National Football League, an attractive component for a prospective college football player.  Colleges also engage in veritable arms races to provide top-of-the-line training facilities which, in turn, are supposed to attract collegiate athletes.  Many future student-athletes also look to the strength of a college's academic programs in deciding where to attend.  These are all part of the competitive market to attract student-athletes whose athletic labor can result in many benefits for a college, including economic gain.

49.     Schools spend significant sums and time recruiting highly skilled Division I athletes.  The University of Tennessee's football team spent nearly $1.5 million on its 2011 recruiting class.

50.     Institutions have also begun to recruit Division I football athletes earlier and earlier in their careers.  Recent reports have detailed college scholarships being offered to kids as young as 14 years old – before they even begin high school.  Examples of costs undertaken by NCAA member institutions to gain access to young athletes and their families include:  travel expenses, letters, phone calls, on-campus visits, and the use of recruiting services.

51.     The NCAA prohibits its member institutions from simply paying student-athletes salaries.  Instead, students with athletic ability often are given Division I football scholarships that may sometimes equal the yearly cost of their education.  In effect, the student-athlete uses his or her athletic abilities on behalf of the NCAA member institution in exchange for the cost of an athletic and academic education, room, and board.  NCAA member institutions pay for these goods and services for student-athletes because student-athletes bring substantial collateral benefits to the school in the form of:  (a) enhanced publicity and recruiting, which increases overall tuition revenue, (b) increased alumni donations, and (c) millions of dollars in gate receipts and licensing revenue.

**V.     UNLAWFUL AGREEMENTS IN RESTRAINT OF TRADE OR COMMERCE**

52.     The NCAA is an association of member institutions that compete against each other to attract revenues, fans, and athletes.  It operates as a cartel to control nearly all aspects of college football.

53.     The specific practices challenged here are:  (i) the NCAA's prohibition on multi-year Division I football scholarships,  (ii) its unlawful caps on the number of football Division I football scholarships that can be awarded by Division I member institutions, and (iii) the NCAA's transfer rules that prohibit a Division I football player from transferring to another NCAA Division I school without loss of athletic eligibility for a period of time.

54.     The restrictions outlined below represent unlawful agreements not to compete in terms of price or output and constitute a naked restraint of trade and commerce.

55.     The restrictions outlined below are inconsistent with the Sherman Act's command that price and supply be responsive to consumer preference.

A.      **Division I Anticompetitive Restrictions**

1.      **NCAA's Prohibition on Multi-year Division I Football Scholarships**

56.      Until recently, the NCAA prohibited member institutions from offering multi-year

Division I football scholarships:  "One-Year Period.  If a student's athletics ability is considered

in any degree in awarding financial aid, such aid shall neither be awarded for a period in excess

of one academic year nor for a period less than one academic year."  *See* NCAA Bylaw 15.3.3.1.

Instead, schools could offer only a one year Division I football discount that is "renewable" at

the discretion of the school.

57.      The NCAA cannot justify its conduct as necessary to preserve amateurism or

maintain "competitive balance."

58.      Indeed, the NCAA itself has acknowledged this explicitly.  Specifically, an

NCAA Presidential Taskforce concluded that:

> The idea of a five-year scholarship reflects the fact that college
> scholarships are fundamentally academic, even if the merit basis is
> sports skill.  Under the current structure of athletics scholarships,
> athletes may be legitimately concerned that their continued access
> to education depends on sports success.  This can create a conflict
> of incentives that may lead to an emphasis on athletics at the cost
> of academics.

Five-year athletic scholarships are necessary because many student-athletes cannot graduate in

four years due to the enormous time demands required of NCAA athletes.

59.      Further indicating that the prohibition is not necessary to maintain amateurism or

competitive balance, prior to 1973, multi-year Division I football scholarships were the norm,

not the exception.  Indeed, the Knight Commission on Intercollegiate Athletics recommended

that schools offer five-year Division I football scholarships instead of one-year renewable

scholarships.  Notably, when evaluating proposed changes to the Bylaws that would have

permitted multi-year athletics scholarships, "NCAA Research Staff" indicated that the

"data/information" that would be relevant to the decision was (i) "the impact on the total population of student-athletes," (ii) "the financial cost to institutions to award multi-year scholarships to student-athletes," (iii) the "scholarship structure for the general student body," and (iv) the "effects multi-year scholarships [would] have with the idea of five years of eligibility."  Nowhere did the NCAA research staff indicate that any concerns existed about the maintenance of competitive balance or protecting amateurism.

60.     Further indicating that the prohibition on multi-year scholarships is not necessary to maintain amateurism or competitive balance, the NCAA, in the face of vigorous opposition from a majority of its member institutions, recently rescinded the prohibition.  The repeal of the multi-year prohibition has not affected amateurism and has had no discernible negative effects on what the NCAA terms the "unique product of amateur intercollegiate competition."

61.     In vigorously opposing the NCAA's successful repeal of the multi-year scholarship prohibition, NCAA member institutions laid bare their anticompetitive motivations. Below are actual comments made by NCAA member institutions to the NCAA in conjunction with an ultimately unsuccessful effort by NCAA member institutions to reverse the NCAA's repeal of the multi-year rule:

> a)      Boise State University:  The multi-year proposal "creates a recruiting disaster . . . Institutions will be competing for recruits by 'making the best deal'. . . . In order to be competitive, institutions may offer multi-year awards so they can sign higher level recruits.  However, there is never a guarantee that the incoming student-athlete will be a good fit for the program and the institution.  If it is a poor fit the program is put in a difficult situation to continue to keep a student-athlete on scholarship."

b)     <u>Indiana State University</u>:  "This proposal . . . is going to create some real nightmares . . . Coaches are going to be compelled to give these multi-year scholarships to compete on the recruiting front with other schools. Problem is, many coaches, especially at the FCS level, in all sports, are usually not around for five years and when the coach leaves, the new coach and institution may be 'stuck' with a student athlete they no longer want . . . or the new coach may have a completely different style of offense/defense that the student athlete no longer fits into.  Yet the institution is 'locked in' to a 5 year contract potentially with someone that is of no 'athletic' usefulness to the program . . . .  To get recruits that will make a program better, coaches are going to be forced to offer these multi-year scholarships just to make sure they have the recruits to help them win . . . The current system works.  We don't need to get into bidding wars where one school offers a 75 percent (scholarship) for two years and the other school then offers 85 percent for three years, etc."

c)     <u>Rutgers, State University of New Jersey, New Brunswick</u>:  "By adopting such legislation, institutions will be leveraged into offering multi-year athletic scholarships to prospective student-athletes in order to solidify a prospective student-athlete's commitment to the institution."

62.     As the above comments demonstrate, the primary motivation of NCAA institutions in instituting the multi-year prohibition was to reduce price competition thereby holding down their labor costs.

2.      **Caps on the Number of Division I Football Scholarships**

63.      In addition, the NCAA imposes highly restrictive caps on the total number of Division I football scholarships that can be granted to student-athletes.  Specifically, the NCAA limits the number of football scholarships that a school can grant each year.  The precise number varies by subdivision.

64.      For the sport of football, the NCAA prohibits Division I FBS schools from providing Division I football scholarships to more than 85 student-athletes.  FCS schools may not award more than 63 full scholarships.

65.      The NCAA's rules regarding the number of Division I football scholarships that can be awarded to student-athletes cannot be justified by amateurism concerns.  Lifting limitations on the number of Division I football scholarships that can be offered to student-athletes would have absolutely no effect on amateurism because student-athletes would continue to receive no wages for their playing.

66.      Nor can the NCAA's current restrictions on the number of football scholarships be justified by competitive balance concerns.  The NCAA's rules actually permit the *most* competitive schools to have *more* scholarships which is the opposite of what would be expected if the NCAA's true concern were maintaining competitive balance. These Bylaws – one-year limit to scholarships and a limit on scholarships per team – are not inherently or obviously necessary for the preservation of amateurism, the student-athlete, or the general product of college football.  Issuing more scholarships (thus creating more amateur players) and issuing longer scholarships cannot be said to have an obviously negative impact on amateurism.

67.      In short, the NCAA's rules capping the duration and number of Division I football scholarships have nothing whatsoever to do with maintaining competitive balance.

68.     But even if they did, "competitive balance" is not a valid pro-competitive justification for restraining price competition among NCAA member institutions for student-athlete labor because numerous methods exist – such as restricting alumni donations or recruiting budgets – by which competitive balance could be maintained without fixing the price of student-athlete labor.

69.     Moreover, any minimal effect on competitive balance is vastly outweighed by anticompetitive effects of the NCAA's caps on the number of Division I football scholarships because the restrictions result in dramatically higher prices for class members and eliminate price competition between schools for the labor of the student athletes.  Consequently, antitrust laws require that the NCAA ensure competitive balance without restraining price competition among NCAA member institutions for student-athletes' labor.

### 3.     Restrictions on Players' Ability to Transfer

70.     The NCAA's rules provide that if a student-athlete at a four-year Division I institution wishes to transfer to a different four-year Division I institution, he must sit out from intercollegiate competition for one academic year while the clock on his five-year window of eligibility continues to run.  NCAA Bylaw 14.5.5.1 states:  "**General Rule.** A transfer student from a four-year institution shall not be eligible for intercollegiate competition at a member institution until the student has fulfilled a residence requirement of one full academic year (two full semesters or three full quarters) at the certifying institution. (Revised: 1/10/91 effective 8/1/91, 4/14/10)."

71.     Certain limited exceptions exist to the year-in-residence requirement, including a so-called one-time transfer exception.  That exception, however, is not available to Division I football players unless the player is transferring from a FBS school to a FCS school and has two

or more seasons of competition remaining, or the player is transferring from a FCS school that offers athletically-related financial aid in football to a FCS school that does not.  Nor may a student-athlete be granted a one-time transfer exception unless the school from which he is transferring consents to it in writing.  *See* NCAA Bylaw 14.5.5.2.10.

72.    A waiver process is available to Division I football players and other student-athletes not eligible for the one-time transfer exception, pursuant to which students who transfer due to difficult personal or family circumstances may be provided with an additional year to complete their eligibility.  Prior to the 2015-16 academic year, these student-athletes could seek a waiver to play immediately after transfer.  But even if they met the stringent requirements for eligibility, the procedure required extensive documentation and was criticized for its inconsistent approval process.

73.    Numerous college sports commentators have criticized the Byzantine nature of the transfer rules.  The sheer complexity of them serve as an impediment and barrier to players' consideration of transferring schools, further entrenching the NCAA's anticompetitive effects in the relevant market.  For example, in 2013, ESPN.com's Eamonn Brennan wrote an article titled "Want to Understand Transfer Rules? Give Up."[3]  He wrote:  "Transfers seem straightforward. A player leaves one school and attends another, and has to sit out one year before he can play for his new team. Simple, right? Wrong: Even that seemingly structured rule is beset by a score of academic timeline requirements and bureaucratic processes."  Mr. Brennan described those requirements as follows:

> A player must receive a written permission-to-contact letter from his current coach. He must have spent a full year in "academic

---

[3] http://espn.go.com/blog/collegebasketballnation/post/_/id/87697/trying-to-understand-transfer-rules-give-up (last visited November 3, 2015).

residence" -- i.e., attending classes as a full-time, 12-credit-hours-
or-insert-your-school's-equivalency student -- before he is eligible
to get back on the court at his new school. There are "4-4" transfers
and "2-4" transfers and different rules therein; there are issues
involving full, partial, or non-qualifying academic status; and there
are waivers and appeals you can make based on specific
circumstances that can change the preexisting requirements, just
like that.

74.     The NCAA each year publishes a document titled "Transfer 101" which purports

to be a guide to help players understand the transfer process.  It in fact is a 30 page, single-

spaced document of which Mr. Brennan writes:  "Ostensibly, this document was created to make

the rules easy to understand and apply. It is filled with handy little case studies; it even has a

glossary of important terms. And if you can read past the third page without help from

prescription ADHD medication, well, I'd love to shake your hand. This stuff is *brutal*."

75.     Earlier this year, the NCAA eliminated the ability of Division I football players to

apply for a waiver to play immediately.  Under the new rule, transferring Division I football

players who would have been eligible for such a waiver will instead receive a sixth year of

eligibility to play.

76.     With the change in the rule, only the small percentage of Division I football

players who fulfill the requirements for the one-time transfer exception (or other enumerated

exceptions in the NCAA rules) and manage to secure permission from their original schools can

play immediately upon transfer.  All other transferring players are forced to sit out from

competition for a year while the five-year clock on their window of eligibility continues to run.

77.     The year-in-residence requirement functions as a penalty imposed upon Division I

football players for switching schools.  Without the ability to play immediately, transferring

student-athletes are less attractive prospects and therefore less likely to secure athletics grants-in-

aid from their new schools. The inability to receive an athletics grant-in-aid is particularly egregious in the case of student-athletes, like Plaintiff, who are forced to transfer because of the loss of an athletics grant-in-aid at their original school. Those without any other financial means available to them may be forced to give up their dreams of competition at the highest levels and instead transfer to a Division II school, or they may have to drop out of school entirely. Thus, as a result of the year-in-residence requirement, class members receive lower amounts of athletics-related financial assistance and other direct compensation than they would receive if class members were permitted to transfer without this limitation.

78.     But for this restraint, greater movement among Division I football players would inevitably occur. Players would seek out the team they most value, whether because of more playing time, a better relationship with the coaching staff, a change in the coaching staff that recruited the player, a better academic fit, or the availability of an athletics grant-in-aid on more favorable terms. Teams, in turn, would also seek out the players they most value. Free player movement would thus result in an optimal and most efficient matching of schools and players.

79.     Through the year-in-residence requirement, the NCAA and its members have thus contracted, combined and conspired to restrict the movement of players between schools in the relevant market, as well as remove some players from the market altogether.

80.     Through the year-in-residence requirement, the NCAA and its members have further contracted, combined and conspired to fix, depress or stabilize the amount, terms and conditions of athletics-based financial assistance to class members in the relevant market.

81.     The NCAA cannot justify its conduct as necessary to preserve education or amateurism. The NCAA has claimed that the year-in-residence requirement exists to "help student-athletes adjust to their new school" and "help[] offset the[e] dynamic" of poor academic

performance by transferring student-athletes over time.[4]   The NCAA also currently states on its website that " [i]n most cases, you may not compete for one year after transferring from a four-year college to another four-year college. This year is an opportunity to adjust to your new school and focus on your studies rather than sports."[5]

82.     But Division I football players are ineligible for a one-time exception to the year-in-residence requirement regardless of academic performance, even though the NCAA admits that "student-athletes who transfer with at least a 2.6 grade-point average have the same likelihood of academic success as a student-athlete who remains at his or her original institution."[6]

83.     Moreover, it has been decades since the NCAA maintained a rule making freshmen ineligible for athletic competition.  Freshmen are less equipped for college academics than are transfer students, who have experienced some college academics, perhaps several years.  And yet freshmen are immediately eligible to play, but transferring players are not.  Similarly, transfers from junior colleges are not required to sit out a year, having had no exposure to a four-year university's more rigorous academic demands.

84.     The NCAA's proffered academic motivations for the year-in-residence requirement are instead a pretext for the true economic motivations behind the rule.  Such motivations are seen most clearly via the one-time transfer exception, which is not available to the vast majority of Division I football players, as well as to Division I basketball and baseball

---

[4] NCAA, *Get the facts about transfers*, May 30, 2012, http://www.ncaa.org/about/resources/medi a-center/news/get-facts-about-transfers (last visited November 3, 2015).

[5] NCAA, Want to transfer?, http://www.ncaa.org/student-athletes/current/want-transfer (last visited November 3, 2015) (see "When Can I Compete?" questionnaire text).

[6] NCAA, *Get the facts about transfers*, May 30, 2012.

players and men's ice hockey players.  The NCAA claims that these sports are "historically academically underperforming,"[7] but as stated above, players in these sports are ineligible for the one-time transfer exception regardless of academic performance.  Rather, these sports also happen to be the highest-revenue sports.  The transfer rules at issue further NCAA members' economic interests in maintaining athletic programs while minimizing financial expenditures related to athletes.  The transfer rules allow schools to lock-in players for significant time periods, while minimizing administrative costs related to player movement, including recruiting and retention expenditures.

85.     Defendants' restraint is also further at odds with their often-professed legal defense of "competitive balance."  The restraint preserves the hegemony of the top "Power 5" conferences, the most powerful members of the NCAA, who are able to recruit the most highly coveted high school prospects in the country.  By locking-in those players, the transfer rules prevent player movement to less-powerful schools and conferences.  Thus, a player may languish at a Power 5 conference school, unable to obtain the playing time promised in the recruiting process, instead of flourishing and developing at a smaller school, to the benefit of the player and fans alike.  Such circumstances would severely threaten the perception of the Power 5 conferences as the ultimate and best destination for high school players.

86.     Defendants' restraint in suit, severely limiting player choice and mobility, is designed simply to further subjugate the rights of college players.  The restraint is at odds with the interests of fans of FBS football, as it limits and restrains the availability of players to schools for which the players may be a better athletic fit, and for which the players may help produce a better product for fans.

---

[7] *Id.*

87.     As noted in the Introduction to this Complaint, the restraints on player movement are in stark contrast to the increasing frequency with which head coaches, assistant coaches, and athletic directors switch schools in search of higher paydays.  There are no such limitations on their movement, and many such circumstances have been heavily publicized.

88.     Numerous commentators and participants in the college sports industry have illustrated, sometimes very bluntly, the lack of any legitimate justifications for the NCAA's transfer prohibition rules.  For example, on April 21, 2015 CBS Sports.com's Gary Parrish wrote in regards to the rule as applied to basketball players that "The point I'd rather make today is one I think we can all agree on, and that's how there's a pretty terrible unintended consequence to the NCAA no longer allowing waivers for transfers to play immediately, and that pretty terrible unintended consequence is this: Players who are run off by their coaches are now basically screwed."  Parrish continued:  'It's wrong,' said one college coach who requested anonymity because he didn't want to speak out publicly against policy. 'You're telling me I can sign a kid, keep him for a year or two, decide I misevaluated him and pull his scholarship, and then that kid has to sit a year no matter what? That's [expletive] up, man. That's just [expletive] up.'"

## VI.     INJURY TO PLAINTIFF AND CLASS MEMBERS

89.     Plaintiff Devin Pugh was a star cornerback at Jenks High School in Jenks, Oklahoma—a traditional prep powerhouse football program—who helped the Jenks Trojans to two state championships. During his senior year season at Jenks, Devin had four interceptions and fourteen pass breakups, and made the All-State Team.

90.     Upon graduating from Jenks in 2010, Devin was recruited by several FBS (then Division I-A) schools, receiving "preferred walk-on" offers from the University of Florida, University of Southern California, Tulsa, Oklahoma University, Oklahoma State University,

Colorado State University, and Utah State University.  He also received a full scholarship offer

from the University of New Mexico, an FBS school.  In addition, Devin received full scholarship

offers from numerous FCS (then Division I-AA) schools around the country, including

Appalachian State (which had in 2007 beat powerhouse University of Michigan and won the

national championship), Eastern Washington, the University of Montana, and South Dakota State

University.

91.     In the end, Devin decided to attend Weber State University, which had a strong

football program, having won the Big Sky Conference the previous year, and a head football

coach, Ron McBride, whom Devin deeply respected and looked forward to playing for.

92.     McBride offered Devin a "full Football Grant-in-Aid" to attend Weber State, by

letter in the spring of 2010.  The letter stated that the Grant-in-Aid, beginning Spring 2011,

consisted of: (1) tuition and registration fees; (2) required course-related fees; (3) room; (4)

meals; and (5) required textbooks.

93.     McBride went further and pledged to Devin that his grant-in-aid would be

renewed annually so long as he did well academically and remained eligible for NCAA

competition.  McBride also verbally promised that his grant-in-aid would still be honored in the

event the current coaching staff departed for any reason.  Unwritten guarantees such as this are a

common part of the recruiting process and indicative of the competitive pressures that schools

face to recruit talented athletes.

94.     Weber State offered to allow Devin to begin classes in the summer of

2010.  Devin accepted the grant-in-aid and committed to play football and attend school at

Weber State.  He enrolled at Weber State in the summer of 2010.

95.     Devin was designated as a "redshirt" member of the Weber State football team for the 2010-11 year, thus allowing the year to not count against his eligibility under NCAA rules to play for four years.  During that time, he fulfilled all athletic and academic requirements to maintain his scholarship, and was a student in good standing at all times.

96.     Devin's grant-in-aid was renewed for the 2011-12 academic year. During that time, he fulfilled all athletic and academic requirements to maintain his scholarship, and was a student in good standing at all times.

97.     Devin played as a redshirt freshman during the 2011-2012 academic year, during which time he excelled as a player, leading the team in turnovers and coming in second in the conference for interceptions.

98.     At the end of the 2011 football season, Ron McBride—the well-respected coach who had recruited Devin—retired.  When he left, the vast majority of the football staff also left the program.  McBride was ultimately replaced with Jody Sears, who had previously been the linebacker coach for the team.  Coach Sears, who was fired by Weber State after serving as Head Coach for only two years, was perceived by many players on the team as difficult to work with— a perception corroborated by his treatment of Devin.

99.     Devin's grant-in-aid was renewed for the 2012-13 academic year.  During that time, he fulfilled all athletic and academic requirements to maintain his scholarship, and was a student in good standing at all times.

100.    In approximately August of 2012, before the start of his redshirt sophomore year, having had an extremely successful first season that confirmed his ability to compete at the highest levels of football, Devin approached Sears about his desire to transfer to an FBS school. Coach Sears cried when Devin asked to transfer, asked him to reconsider, and told him to "pray

about it." The tactic was successful. Despite advice to the contrary from his mother and family, Devin trusted that Coach Sears would continue to value him as a player and decided to stay with the Weber State team. After Devin informed Coach Sears of his decision to stay, Sears demanded that Devin stand up in front of the football team and "apologize" for thinking about leaving the team.

101.    From that point on, despite the fact that Sears had implored Devin to stay, Devin's status in the eyes of the head coach only seemed to decline. Coach Sears started Devin the first three games of his sophomore (2012) season, but then sat him out of every game for the rest of the season. This was despite the fact that Devin had played so well in his first—and only—three games that by the end of the season he was still first or second on the team for interceptions.

102.    At the end of the season, in approximately December 2012, Coach Sears sat Devin down in his office and informed him that Weber State would not be renewing his scholarship, and he should look into transferring to another school.

103.    Devin was shocked, as were his position coach, Defensive Back Coach Eric Lewis, and both team captains (offense and defense)—all of whom went to Coach Sears and asked him to reconsider the decision. He refused.

104.    Devin also went back to Coach Sears and asked him again to reconsider, but Sears again refused. With one semester to figure out what to do, Devin put together a highlight tape at his mother's urging, and his mother posted it online and sent it out to various schools. Almost immediately, Devin began to get positive responses from other schools, including FBS schools Colorado State, University of Colorado, and Troy University.

105.    Ultimately, Devin was offered full grants-in-aid at several FBS schools, including Colorado State, the University of Colorado, and Troy University. In addition, he received full

grant-in-aid offers from FCS schools, including Portland State, University of Montana, and Eastern Washington University (which had just won the national championship the year prior). All of these grant-in-aid offers, however, were contingent upon Devin's ability to play two more years of NCAA football.

106.    Because the NCAA transfer rules would require him to sit out of competition for a full season, Devin only had one year of competition left on his five-year clock.  As a FCS football player looking to transfer to a four-year FBS or FCS school with a grant-in-aid offer, Devin was not eligible for the NCAA's one-time transfer exception.  So he applied for the only option available to him -- a "hardship waiver," which would have allowed him to play immediately upon transfer and thus be able to play for the two years remaining on his five-year clock.  The NCAA, however, denied Devin's request for a hardship waiver.

107.    Because of Devin's inability to play two more years of football, every one of the schools that had previously offered him a grant-in-aid rescinded their offers.

108.    Devin was devastated, and at first balked at the idea of playing football for a Division II school, knowing that he was capable of playing at the highest levels and having become generally disillusioned with football after losing his grant-in-aid.  But after looking at tuition prices and realizing that he couldn't afford college on the $9 per hour he was making working at a group home for disabled children, Devin started looking at Division II schools.  He settled on Colorado State–Pueblo, and after a couple conversations with head coach John Wristen, Devin agreed to join the Thunderwolves for the 2013 season.  Because he was transferring from a Division I school to a Division II school, he was eligible for a one-time transfer exception and would not have to sit out for a year, thereby giving him two seasons left to play NCAA football.

109.    Although Devin was grateful to be allowed to continue his college education, the grant-in-aid he received from CSU Pueblo was far less than his grant-in-aid at Weber State, covering only tuition, but not books, housing, or any other costs.  Due to the decreased amount of his grant-in-aid, the amount of loans Devin had to take out to attend school roughly doubled— from approximately $3,000 per year at Weber State to approximately $6,000 per year at CSU Pueblo.

110.    Coach Wristen gave Devin a starting position on the team, but after tearing his quadriceps muscle at the start of the season, Devin ended up having to sit out for half of his junior year football season.  After recovering from that injury, Devin made an interception in his first play back, and continued to do well the rest of the season.

111.    The following year, worried about additional football injuries and having received an offer to continue the full-time job he had been doing during the summer of 2014, Devin left school with 9 credits left to graduate.  He intends to finish those credits.

112.    In a competitive market, Plaintiff would have initially received a multi-year grant-in-aid offer at an FBS school for the true Cost of Attendance.  Plaintiff was injured by the NCAA's artificial and anticompetitive caps on the duration and number of athletics grants-in-aid.

113.    In a competitive market, Plaintiff would have received additional grant-in-aid offers from Division I schools.  Plaintiff was deprived of these choices by the NCAA's artificial and anticompetitive restrictions on the number of grants-in-aid that NCAA member institutions are permitted to offer.  The NCAA's wholly artificial caps on the number and distribution of Division I football grants-in-aid reduces the overall supply of football grants-in-aid available to student-athletes thereby forcing them to accept far less compensation than they would have

received for their labor.  Despite the billions of dollars in revenue generated by Division I football programs, the NCAA rules artificially restrict football grants-in-aid.

114.    In a competitive market, Plaintiff would have received a multi-year grant-in-aid that covered all years of eligibility.  The NCAA's prohibition on multi-year Division I football grants-in-aid has injured thousands of student-athletes by causing them to pay millions more in tuition when their Division I football scholarships are reduced or not renewed.  When these Division I football grants-in-aid are reduced or not renewed, a student is left with the decision to remain at the school and pay for tuition and expenses out of pocket, consider transferring, or drop out of school all together.

115.    In a competitive market, Plaintiff would have been able to transfer without limitation and, as a result, would have had several Division I full grant-in-aid offers from which to choose.  The NCAA's artificial and anticompetitive anti-transfer rules, pursuant to which a Division I football player must sit out of competition on his five-year clock unless he fulfills the very narrow and stringent requirements for a hardship waiver, has injured thousands of student-athletes by causing them to either lose an opportunity to transfer schools or give up a year of play.  Division I football players who have lost grants-in-aid at their current schools are further faced with the decision to transfer to a Division I school where they are unlikely to receive full grants-in-aid, if any aid at all, or transfer to a less competitive Division II school.

## VII.    CLASS ALLEGATIONS

116.    Local Rule 23-1 provides that a party seeking to maintain a class must include in the complaint "a reference to each part of Fed. R. Civ. P. 23 that the party relies on in seeking to maintain the case as a class action."  Plaintiff complies with this rule in paragraphs 117-126.

117.    Plaintiff sues on his own behalf and the following two classes, including the

following "Injunctive Relief Class" pursuant to Rule 23(a) and (b)(2):

> All individuals who, from December 17, 2007 to the present, have
> been classified under NCAA rules as an "initial counter" (during
> their first fall term on campus or in the spring term prior to their
> first fall term on campus) on an NCAA Division I football team;

and the following "Core Issues Class" pursuant to Rule 23(a), (b)(3), and (c)(4):

> All individuals who, from December 17, 2007 to the present, have
> been classified under NCAA rules as an "initial counter" (during
> their first fall term on campus or in spring term prior to their first
> fall term on campus) on an NCAA Division I football team, and
>
> (1) were recruited by at least one school that is a member of the
> NCAA's Division I Football Bowl Subdivision ("FBS") (at the
> time of their recruitment or during their period of NCAA athletics
> eligibility), and
>
> (2) did not receive their initial year's athletics-related grant-in-aid
> for the full duration of their undergraduate education or five (5)
> years, whichever is shorter.

118.    Plaintiff additionally sues on his own behalf and the following two classes,

including the following "Transfer Injunctive Relief Class" pursuant to Rule 23(a) and b(2):

> All individuals who, from November 4, 2011 to the present, have been a member
> of an NCAA Division I football team;

and the following "Transfer Core Issues Class" pursuant to Rule 23(a), (b)(3), and (c)(4):

> All individuals who, from November 4, 2011 to the present, have sought to
> transfer from one NCAA Division I football school to another NCAA Division I
> football school, and pursuant to NCAA transfer rules, were considered to be, or
> would have been considered to be, athletically ineligible to participate in NCAA
> Division I football for any period of time.

119.    Excluded from all proposed Classes are the employees of the NCAA and their

member institutions, employees, class counsel and their employees, and the judicial officers and

associated court staff assigned to this case.  Excluded from the proposed "Core Issues Class" are

individuals whose athletics-related grants-in-aid were reduced, cancelled or not renewed due to one of the reasons enumerated in Bylaw 15.3.4.2 of the NCAA Division I Manual.

120.    Members in the Classes are collectively referred to as "class members" or "the Class" unless otherwise specified.

121.    The persons in the Class are so numerous that individual joinder of all members is impracticable under the circumstances of this case.  Although the precise number of such persons is unknown, the exact size of the Class is easily ascertainable, as each class member can be identified by using Defendant's records.  Plaintiff is informed and believes that there are many thousands of Class members.

122.    There are common questions of law and fact specific to the Class that predominates over any questions affecting individual members, including:

> a.   Whether the NCAA and its member institutions unlawfully contracted, combined and conspired to unreasonably restrain trade in violation of Section 1 of the Sherman Act by agreeing not to offer multi-year Division I football scholarships;
>
> b.   Whether the NCAA and its member institutions unlawfully contracted, combined and conspired to unreasonably restrain trade in violation of Section 1 of the Sherman Act by agreeing to limit the number of Division I football scholarships available to students;
>
> c.   Whether the NCAA and its member institutions unlawfully contracted, combined and conspired to unreasonably restrain trade in violation of Section 1 of the Sherman Act by agreeing to restrict NCAA Division I

football players' ability to transfer to other NCAA Division I football schools without being deemed athletically ineligible for a period of time;

d.  The definition of the relevant market;

e.  Whether the NCAA has any pro-competitive justification for its conduct;

f.  Whether the pro-competitive effects of the conduct, if any, outweigh the clear injury to class members;

g.  Whether class members have suffered antitrust injury; and

h.  The nature and scope of injunctive relief necessary to restore a competitive market.

123.   Plaintiff's claims are typical of the Class claims, as they arise out of the same course of conduct and the same legal theories as the rest of the Class, and Plaintiff challenges the practices and course of conduct engaged in by Defendant with respect to the Class as a whole.

124.   Plaintiff will fairly and adequately protect the interests of the Class.  He will vigorously pursue the claims and has no antagonistic conflicts.  Plaintiff has retained counsel who are able and experienced class action litigators and are familiar with the NCAA.

125.   Defendant has acted or refused to act on grounds that apply generally to the Class, and final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.  A class action is also appropriate because Defendant has acted and refuses to take steps that are, upon information and belief, generally applicable to thousands of individuals, thereby making injunctive relief appropriate with respect to the Class as a whole.

126.   Questions of law or fact common to class members predominate over any questions affecting only individual members.  Resolution of this action on a class-wide basis is superior to other available methods and is a fair and efficient adjudication of the controversy

because in the context of this litigation no individual class member can justify the commitment of the large financial resources to vigorously prosecute a lawsuit against Defendant.  Separate actions by individual class members would also create a risk of inconsistent or varying judgments, which could establish incompatible standards of conduct for Defendant and substantially impede or impair the ability of class members to pursue their claims.  It is not anticipated that there would be difficulties in managing this case as a class action.

## VIII.   TOLLING OF THE STATUTE OF LIMITATIONS

127.    This section only applies to Plaintiff's claims regarding the NCAA's multi-year scholarship ban and the NCAA's cap on the number of athletic scholarships that a school may offer.  This section is not applicable to Plaintiff's claims regarding the NCAA transfer rules.

128.    On October 25, 2010, a class action seeking identical relief on behalf of an identical class of student athletes was filed in the Northern District of California.  Following transfer to this District, the action was dismissed and a final judgment entered.  The Plaintiffs in that action appealed to the United States Court of Appeals for the Seventh Circuit, which affirmed the dismissal on June 18, 2012.

129.    As a consequence of the previously filed action referenced above, the statute of limitations in this action has been tolled from October 25, 2010 to June 18, 2012.

130.    On July 25, 2012, a second class action, *Rock v. NCAA*, was filed in this District. The action also seeks identical relief on behalf of an identical class of student athletes stemming from the NCAA's ban on multi-year grants-in-aid and limit on the number of grants-in-aid.  As a consequence of this previously filed action, the statute of limitations as to these claims has been tolled since July 25, 2012.

## IX.    CAUSES OF ACTION

## FIRST CAUSE OF ACTION

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT 15 U.S.C. § 1

**(Applicable to Plaintiff's Claims Regarding the NCAA's Prohibition of Multi-year Scholarships and the NCAA's Cap on Athletic Scholarships)**

131.    Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

132.    The NCAA and NCAA member institutions by and through their officers, directors, employees, agents or other representatives have entered into an unlawful agreement combination and conspiracy in restraint of trade.  Specifically, the NCAA and NCAA member institutions have unlawfully agreed to artificially fix or reduce the amount of Division I football scholarships to be awarded to class members in exchange for the student-athletes' labor by agreeing amongst themselves not to offer multi-year Division I football scholarships and by agreeing among themselves to artificially limit the overall supply of Division I football scholarships.  These unlawful agreements have unreasonably restrained price competition among NCAA member institutions for student-athletes' labor.

133.    Class members seeking to provide their athletic labor in exchange for in-kind benefits, including grants in aid, have been deprived of the benefits of free and open price competition.

134.    Class members' choice of which NCAA Division I member institution to attend has been artificially restricted by the NCAA's restrictions on the number and amount of Division I football scholarships.

135.    Defendant and its member institutions have undertaken this conduct in the United States and its territories.

136.    Defendant's business activities and operations involve and affect the interstate movement of students and the interstate flow of substantial funds (including, but not limited to, tuition, room and board, and mandatory fees).

137.    As a direct result of the conduct of Defendant and its co-conspirators, class members have been injured.  Price competition among NCAA member institutions has been unreasonably restrained, and as a result class members have been injured because they are paying or have paid substantially more for tuition than they would in a competitive market.

138.    The conduct of the NCAA is continuing and will continue to impose antitrust injury on student-athletes unless injunctive relief is granted.

139.    In addition, injunctive relief is necessary to remedy the effects of the NCAA's past wrongful conduct.

## SECOND CAUSE OF ACTION

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT 15 U.S.C. § 1

### (Applicable to Plaintiff's Claims Regarding the NCAA's Transfer Rules)

140.    Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein

141.    The NCAA and NCAA member institutions by and through their officers, directors, employees, agents or other representatives have entered into an unlawful agreement combination and conspiracy in restraint of trade.  Specifically, the NCAA and NCAA member institutions have unlawfully agreed to restrain the ability of NCAA Division I football players to transfer to other Division I football schools without loss of athletics eligibility.  These unlawful agreements have unreasonably restrained competition among NCAA member institutions for student-athletes' labor.

142.     Class members seeking to provide their athletic labor in exchange for in-kind benefits, including grants in aid, have been deprived of the benefits of free and open competition.

143.     Class members' choice of which NCAA Division I member institution to attend has been artificially restricted by the NCAA's restrictions on their ability to transfer without loss of athletics eligibility.

144.     Defendant and its member institutions have undertaken this conduct in the United States and its territories.

145.     Defendant's business activities and operations involve and affect the interstate movement of students and the interstate flow of substantial funds (including, but not limited to, tuition, room and board, and mandatory fees).

146.     As a direct result of the conduct of Defendant and its co-conspirators, class members have been injured.  Competition among NCAA member institutions has been unreasonably restrained, and as a result class members have been injured because their choices of schools to attend have been limited.

147.     The conduct of the NCAA is continuing and will continue to impose antitrust injury on student-athletes unless injunctive relief is granted.

148.     In addition, injunctive relief is necessary to remedy the effects of the NCAA's past wrongful conduct.

## PRAYER FOR RELIEF

149.     WHEREFORE, Plaintiff prays for judgment against Defendant as follows:

A.     Certification of the action as a Class Action pursuant to the Federal Rules of Civil Procedure, and appointment of Plaintiff as the Class Representatives and his counsel of record as Class Counsel;

B.      A declaration by this Court that Defendant's conduct constituted a conspiracy and that Defendant is liable for the conduct of or damage inflicted by any other co-conspirator;

C.      A declaration that the prohibition on multi-year athletic-based scholarships is unlawful;

D.      A declaration that the NCAA's restrictions on the number of athletic-based scholarships that can be offered to student-athletes are also unlawful;

E.      A declaration that the NCAA's restrictions on players' ability to transfer without loss of athletic eligibility are also unlawful;

F.      Actual damages, trebled damages, punitive damages, and such other relief as provided by the statutes cited herein;

F.      Pre-judgment and post-judgment interest on such monetary relief;

G.      Equitable relief requiring NCAA member institutions to offer multi-year Division I football scholarships to remedy their past wrongful conduct, and enjoining Defendant from artificially reducing the total supply of scholarships available to NCAA student-athletes, and enjoining Defendant from restricting players' ability to transfer without loss of athletic eligibility;

H.      The costs of bringing this suit, including reasonable attorneys' fees; and

I.      All other relief to which Plaintiff and class members may be entitled at law or in equity.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all issues triable of right by jury.

RESPECTFULLY SUBMITTED this
5th day of November, 2015

By  */s/ William N. Riley*
William N. Riley (#14941-49)
Joseph N. Williams (#25874-49)
RILEY WILLIAMS & PIATT, LLC
Hammond Block Building
301 Massachusetts Avenue
Indianapolis, IN 46204
Telephone:  (317) 633-5270
Facsimile:  (317) 426-3348
wriley@rwp-law.com
jwilliams@rwp-law.com

Steve W. Berman
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com
(*Pro Hac Vice* to be filed)

Elizabeth A. Fegan
HAGENS BERMAN SOBOL SHAPIRO LLP
455 N. Cityfront Plaza Drive, Suite 2410
Chicago, IL 60611
Telephone: (708) 628-4960
Facsimile:  (708) 628-4950
beth@hbsslaw.com
(*Pro Hac Vice* to be filed)

Jon T. King
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Ave., Suite 202
Berkeley, CA  94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
jonk@hbsslaw.com
(*Pro Hac Vice* to be filed)

Stuart M. Paynter
THE PAYNTER LAW FIRM PLLC
1200 G Street N.W., Suite 800
Washington, D.C.  20005
Telephone: (202) 626-4486
Facsimile:  (866) 734-0622
stuart@smplegal.com
(*Pro Hac Vice* to be filed)

*Attorneys for Plaintiff*